# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CENTRAL DIVISION

UNITED STATES OF AMERICA,

       Plaintiff,

vs.

CHRISTOPHER ISIAH MOSLEY,

       Defendant.

No. CR14-3030-MWB

*REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS*

---

## TABLE OF CONTENTS

I.    **INTRODUCTION**................................................................2

II.   **FINDINGS OF FACT**..........................................................4

III.  **DISCUSSION**...................................................................8
    A.    **Did Entry Onto Mosley's Property Violate The Fourth Amendment?**.....................................................9
        1.   *Applicable Standards* ......................................9
        2.   *Analysis* .........................................................10
    B.    **Did Mosley's Seizure and Arrest Violate The Fourth Amendment?** .... 12
        1.   *Applicable Standards* ......................................12
        2.   *Analysis* .........................................................13
    C.    **Did The Seizure and Search Of The Bag Violate The Fourth Amendment?**.....................................................14
        1.   *Applicable Standards* ......................................14
        2.   *Analysis* .........................................................15
            a.   *Seizure of the bag*.............................................15
            b.   *Search of the bag* ............................................17
                i.   *Abandonment*.................................................17
                ii.   *Plain View/Plain Smell* ................................20
    D.    **Should Evidence Gathered From Subsequent Search Warrants Be Suppressed?**.....................................................25
        1.   *Applicable Standards* ......................................25
        2.   *Analysis* .........................................................25

IV.   **CONCLUSION** ................................................................26

# I.    INTRODUCTION

Defendant Christopher Mosley is charged by indictment (Doc. No. 2) with two counts of possession with intent to distribute a controlled substance, one count of possession of a firearm in furtherance of drug trafficking crime and one count of possession of a firearm by a felon.  He has filed a motion (Doc. No. 18) to suppress evidence.  Plaintiff (the Government) has filed a resistance (Doc. No. 25) and Mosely has filed a reply (Doc. No. 26).  The Trial Management Order (Doc. No. 14) assigns motions to suppress to me to conduct any necessary evidentiary hearings and to prepare reports on, and recommended dispositions of, those motions.

I held an evidentiary hearing on September 3, 2014.  Due to time constraints I was not able to hear arguments at that time.  The hearing resumed for oral arguments on September 15, 2014.  On both dates, Assistant United States Attorney Shawn Wehde appeared on behalf of the Government while Mosley appeared personally and with his attorney, Robert Rehkemper.

During the evidentiary portion of the hearing, the Government called the following witnesses:  Robin Ulicki, Fort Dodge Police Department (FDPD) Officers Leighton Walker, Joe Roetman and FDPD Lieutenant Dennis Mernka.  The Government also introduced the following exhibits, all of which were admitted into evidence without objection:

| | |
|---|---|
| *Government Exhibit 1*: | 5/7/14 Audio recording 911 call |
| *Government Exhibit 2:* | 5/7/14 Audio radio traffic |
| *Government Exhibit 3:* | 5/7/14 Call for Service Record |
| *Government Exhibit 4:* | Photograph (aerial) |
| *Government Exhibit 5:* | Photograph (aerial) |
| *Government Exhibit 6:* | Photograph (street) |

| | |
|---|---|
| *Government Exhibit 7:* | Photograph (street) |
| *Government Exhibit 8:* | Photograph (street) |
| *Government Exhibit 9:* | Photograph (street) |
| *Government Exhibit 10:* | Photograph (street) |
| *Government Exhibit 11:* | Photograph (bag) |
| *Government Exhibit 12:* | Photograph (bag) |
| *Government Exhibit 13:* | Photograph (jar/bag) |
| *Government Exhibit 14:* | Photograph (sack) |
| *Government Exhibit 15:* | Photograph (bag contents) |

Doc. Nos. 43-1 through 43-3.

Mosley called the following witnesses: FDPD Detective Ryan Gruenberg and Wanda Mosley. Mosley also introduced the following exhibits, all of which were admitted into evidence without objection:

| | |
|---|---|
| *Defense Exhibit A*: | Photograph (front of residence) |
| *Defense Exhibit B:* | Photograph (east side of residence) |
| *Defense Exhibit C:* | Photograph (west side of residence) |
| *Defense Exhibit D:* | Photograph (west side of residence) |
| *Defense Exhibit E:* | Photograph (northwest side looking south) |
| *Defense Exhibit F:* | Photograph (west side of residence-closer view) |
| *Defense Exhibit G:* | Photograph (north side of residence from west) |
| *Defense Exhibit H:* | Photograph (east side of residence looking south) |

| | |
|---|---|
| *Defense Exhibit I:* | Photograph (north side of residence looking southwest) |
| *Defense Exhibit J:* | Photograph (north side of residence looking north) |
| *Defense Exhibit K:* | Photograph (north side of residence looking south) |
| *Defense Exhibit L:* | Photograph (north side of residence looking south) |
| *Defense Exhibit M:* | Photograph (north side of residence looking north) |
| *Defense Exhibit N:* | Photograph (northwest corner of residence) |
| *Defense Exhibit O:* | Photograph (west side of residence looking south) |
| *Defense Exhibit P:* | Photograph (southwest corner of residence) |
| *Defense Exhibit Q:* | Webster County Search Warrant File for search of 1100 10th Ave. SW |
| *Defense Exhibit R:* | Webster County Search Warrant File for bank accounts |

Doc. No. 43-4.  The motion is now fully submitted.


## II.      FINDINGS OF FACT

Based on the evidence presented, I make the following findings of fact (additional findings will be included in the analysis of specific arguments):

At approximately 10:43 p.m. on May 7, 2014, the Fort Dodge Police Department Communications Center received a 911 call from a female caller who described an incident of domestic abuse.  She identified herself to the dispatcher, Robin Ulicki, as

"Chiesa" but did not give a last name. She reported that her assailant, "Chris Towns," had put his hands around her neck and pushed her down, causing her to scrape her knee. She told Ulicki she was "ok" and did not need medical attention. When asked about her location, Chiesa was unable to give a street address. She told Ulicki she was outside a yellow house on 11th Avenue SW, near the cross street of "10th or something." She agreed to wait outside the yellow house until police arrived and advised that her assailant was inside the house. She stated that she was not aware of any weapons that her assailant might possess.

FDPD Officer Leighton Walker was the first officer to arrive in the general location Chiesa described, followed closely by Officer Joe Roetman. Lieutenant Dennis Mernka arrived in the area a few minutes later. After a brief search of the area, Walker and Roetman were unable to locate Chiesa. Ulicki advised the officers that her attempt to re-contact Chiesa failed but that the phone number Chiesa used was in the FDPD's Records Management System (RMS). The RMS indicated that the number had previously been associated with the address of 1100 10th Avenue SW, which is in the area Chiesa had described. A brown house owned by defendant Christopher Mosley is located at that address.

Based on this information, Walker parked in front of Mosely's house and approached the front door to investigate Chiesa's report. As Walker approached, he saw an African-American man slam the door closed. Walker knocked loudly on the screen porch door, identified himself as a police officer and yelled for the occupant to open the door and answer questions about the reported domestic abuse. When Roetman arrived, he joined Walker at the front door, began knocking and threatened to kick the door in if they were not allowed entry. As Roetman continued knocking and yelling at the front door, Walker walked through Mosley's yard to the back of the house. As Walker reached the back of the house, an African-American man, later identified as Mosley, ran from the back door with a black duffel bag in hand towards the tree line north of the property.

Walker chased Mosley, radioed to his fellow officers that Mosley was running and commanded him to stop. Mosley ignored the command and continued to run. When Mosley was close to a line of parked cars on his property, he threw the black duffel bag between two of the cars and then changed directions, running away from the bag and around the side of the house toward the front yard. Walker saw Mosley drop the bag but continued the chase. Walker and Roetman stopped Mosley in the front yard. Mosley struggled with the two officers to the point that Mernka, who had just arrived at the scene, had to help secure him in handcuffs. Mosely was arrested for interference with official acts and was placed in the back of a squad car.

Once Mosely was secured, Walker told Roetman and Mernka about the duffel bag. Mernka instructed Walker to find the bag and secure it. Walker returned to the back of the house, went to the line of parked cars and located the bag. Walker testified that he could smell marijuana when he approached the bag but did not include this detail in his incident report. Walker also testified that the bag was approximately twenty percent unzipped and that he could see a plastic or glass container inside. He testified that based on his experience, he thought the container could be drug packaging and marijuana.

During this time, heavy rain began to fall. Mernka joined Walker in the back yard and testified that he, too, could smell marijuana emanating from the duffel bag. However, Mernka failed to note this fact in his incident report. Mernka testified that the bag was unzipped approximately 6 to 12 inches and that he was able to look into the bag by focusing a flashlight into the opening. He testified that he saw plastic-cellophane wrapping inside the bag which, based on his experience, he believed could be drug packaging. However, he could not actually see any drugs or contraband in the bag.

Mernka directed Walker to find a camera and document the situation. Walker went to his squad car, retrieved his camera and returned to the back of the house to take photos of the bag and scene. Walker testified that he was able to take only one photograph of the bag before the camera flooded and shut down due to the heavy rain. Walker further

testified that he uploaded that photograph to his computer upon returning to the station. For reasons that were not explained, the photograph was lost.

The duffel bag was taken to Walker's squad car, placed in the trunk, and delivered to Detective Ryan Gruenberg at the Fort Dodge Law Enforcement Center. Both Walker and Mernka testified neither of them touched the zipper on the bag or any of the contents. No warrant was issued prior to the seizure of the duffel bag.

Roetman testified that after Mosely was secured, he entered the house without a warrant to find out if Chiesa was inside. After Roetman determined she was not present, Mernka entered the home and told Roetman that the duffel bag contained a large quantity of narcotics. Roetman noted this comment in his incident report. While Chiesa was not found in the home, Roetman was able to make telephone contact with her about an hour later.

At the Law Enforcement Center, Detective Ryan Gruenberg photographed the bag and documented in his report that it was "fully zipped" when it arrived. However, at the hearing Gruenberg testified he was unsure of whether the bag was fully zipped or partially zipped when he first encountered it. One photograph of the bag that appears to have been taken before it was searched was received into evidence. Gov't Ex. 11. Based on the angle of that photograph, it is not clear whether the bag is fully or partially closed. In any event, Gruenberg then opened the bag and photographed it contents. Next, he removed all the containers in the bag, photographed each, opened them, and photographed their contents. All of the contents, including a brown paper bag, appear to have been dry at the time they were photographed. *See* Gov't Exs. 12 to 15.

During his search of the bag, Gruenberg discovered marijuana and crack cocaine. He also found a firearm, but no photograph of that firearm was entered into evidence. No warrant was obtained before Gruenberg opened and searched the bag.

On May 8, 2014, Special Agent Eric Young applied for a search warrant for Mosley's home at 1100 10th Avenue SW and his black LG cellphone. The search warrant application was based primarily on the evidence gathered from the search of the duffel

bag. Indeed, during oral argument counsel for the Government acknowledged that the warrant to search Mosely's home was issued as a result of the items found in the bag. The search of Mosley's home resulted in the seizure of additional narcotics including marijuana, crack cocaine and unlabeled prescription pills. The officers executing the warrant also found financial documents for bank accounts at Wells Fargo Bank. Based on the evidence found in the duffel bag and the new evidence found in Mosley's home, Special Agent Young obtained a warrant concerning the bank accounts. That warrant was executed and funds totaling $7,213.72 were seized from Mosely's accounts.

## III.   DISCUSSION

Mosley argues the searches and seizures that occurred on May 7th and 8th violated his rights under the Fourth Amendment to the United States Constitution. Mosley contends that because the FDPD officers did not have a warrant to search his home or the duffel bag on the evening of May 7, 2014, any entry onto and subsequent search or seizure of that property was *per se* unconstitutional. He also argues the search warrants obtained and executed on May 8, 2014, were based on evidence gathered from the unconstitutional search and are fruits of the poisonous tree. He contends all evidence gathered from the searches and seizures should be suppressed.

Mosley also argues that because the FDPD officers did not have an arrest warrant when they arrested him on his own property, the arrest violated his Fourth Amendment rights. Mosley suggests the officers did not have the articulable suspicion necessary for a *Terry* stop, nor did they have probable cause for the arrest. Mosley contends there were no exigent circumstances allowing the officers to constitutionally and legally seize him for any period of time.

The Government argues that the officers' actions of entering Mosely's property, arresting him, seizing his bag and searching that bag were constitutional under the circumstances and, therefore, that none of the evidence obtained on May 7 and 8, 2014,

should be excluded. The Government contends the officers' entry onto Mosley's property was permissible due to exigent circumstances arising from the health and safety of a person reporting a domestic assault. The Government further argues that the officers were entitled to conduct a *Terry* investigatory stop of Mosely and had probable cause to arrest him. The Government contends no warrant was necessary to seize and then search Mosley's duffel bag because (a) Mosley abandoned the bag when he dropped it while fleeing and (b) the plain view/plain smell exception applies. Finally, the Government argues because evidence from the duffel bag was lawfully obtained, search warrants were properly issued based on that evidence and the additional evidence located during the execution of those warrants was obtained legally.

## A.   *Did Entry Onto Mosley's Property Violate The Fourth Amendment?*

### 1.   *Applicable Standards*

"The right of the people to be secure in their... houses... against unreasonable searches and seizures shall not be violated." U.S. Const. amend IV. A "search conducted outside the judicial process, without prior approval by judge or magistrate, is *per se* unreasonable under the Fourth Amendment." *Katz v. United States*, 389 U.S. 347, 357 (1967). "This protection extends to the curtilage surrounding a home," *United States v. Wells*, 648 F.3d 671, 675 (8th Cir. 2011) (quoting *United States v. Weston,* 443 F.3d 661, 666 (8th Cir. 2006)), "which is the area to which extends the intimate activity associated with the sanctity of a man's home and the privacies of life, and therefore, has been considered part of the home itself for Fourth Amendment purposes." *Id.* (quoting *Oliver v. United States*, 466 U.S. 170, 180 (1984)). "Consequently, curtilage generally should be treated as the home itself." *Id.* (quoting *United States v. Dunn*, 480 U.S. 294, 300 (1987)). When the Fourth Amendment has been violated, evidence obtained during that violation is subject to exclusion. *Weeks v. United States*, 232 U.S. 383, 393 (1914).

There are exceptions to the Fourth Amendment's warrant requirement. *Katz*, 389 U.S. at 357. A warrant is generally required to enter a house unless an officer "acts with probable cause in the presence of exigent circumstances." *United States v. Schmidt*, 403 F.3d 1009, 1013 (8th Cir. 2005). Exigent circumstances exist when police officers reasonably believe they need to assist persons who are seriously injured or threatened with such injury, or to otherwise protect and preserve life. *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006). An action by law enforcement is reasonable under the Fourth Amendment regardless of the individual officer's state of mind, as long as the circumstances, viewed objectively, justify the action. *Id.* at 404 (quoting *Scott v. United States*, 436 U.S. 128, 138 (1978)). An important factor to consider when determining whether any exigency exists is the gravity of the underlying offense. *Welsh v. Wisconsin*, 466 U.S. 740, 753 (1984).

### 2.    *Analysis*

Mosley argues that Walker acted unreasonably when he stepped off the front porch of Mosely's house and walked into the side and back yard of the property without a warrant. Mosley contends this intrusion into his privacy was *per se* unconstitutional, arguing that the officer had no reason to believe exigent circumstances existed. More specifically, Mosley argues the officer had no information indicating the alleged victim, Chiesa, was in the house or that Mosley had any information regarding her call. Thus, Mosely contends, the officers had no reason to question him or enter his property. Viewing the circumstances objectively, however, I have no troubling finding that exigent circumstances existed for Walker to enter Mosley's property.

Walker was dispatched to the general area of 11th Avenue and 10th Street because a female caller reported a domestic assault. The caller was unable to provide her exact location but assured dispatch that she would wait for the police outside and that her assailant was inside the residence. When officers arrived in the area they were unable to

find anyone outside. It is certainly reasonable, and in fact expected, for the officers to be concerned about the health and welfare of a caller who cannot be found after reporting a domestic assault and stating that she would remain outside until officers arrived.

In accordance with protocol, the dispatcher ran a history report on the caller's phone number, which showed she was associated with 1100 10th Avenue SW, an address that is in the area the caller described. Based on that information, it was clearly reasonable to suspect that the caller might be at that address. Indeed, it would have been unthinkable at that point to ignore the information and not approach the residence at that address.

Walker, the first to arrive, saw a man inside the house slam the front door as Walker approached. Walker testified that this appeared to be no coincidence, as he and the occupant made brief eye contact before the occupant shut the door. In other words, an occupant of the home saw a police officer approaching and hastily closed the door. This would have caused any reasonable officer to be even more suspicious that something may have been amiss involving the caller who reported domestic assault.

Next, there was no response as Walker (and then Roetman, as well) knocked and announced at the front door. By this point, the officers knew that at least one occupant was present in the home and that the address was associated with the telephone number of a caller who had just reported being assaulted in that geographic location. Again, it would have been unthinkable for the officers to simply return to their vehicles and drive away. One can only imagine the justifiable criticism they would have faced had it turned out that Chiesa was being harmed and/or held against her will inside the home.

Thus, Walker's decision to walk around Mosely's home toward the back yard, in an effort to investigate further, was a reasonable response to exigent circumstances. *See United States v. Goodrich*, 739 F.3d 1091, 1096 (8th Cir. 2014) (holding that under the circumstances present, officers could have reasonably believed that a victim and/or armed suspect was inside a home). There was clearly a need for law enforcement to, at the very least, interview the occupants of the house or search the house and accompanying area

for the caller. Because reasonable and legitimate concerns for the caller's safety were present, the warrantless entry by law enforcement onto Mosely's property did not violate Mosley's Fourth Amendment rights.

**B.      *Did Mosley's Seizure and Arrest Violate The Fourth Amendment?***

**1.      *Applicable Standards***

A law enforcement officer may seize a person and conduct a brief investigatory stop when he or she has a reasonable, articulable suspicion that criminal activity is afoot. *Terry v. Ohio*, 392 U.S. 1, 21, 30 (1968) see also *United States v. Sokolow*, 490 U.S. 1, 7 (1989). Courts must use a totality of the circumstances analysis when determining whether an officer had reasonable, articulable suspicion or a "particularized and objective basis" for their suspicion. *United States v. Arvizu*, 534 U.S. 266, 273 (2002). The totality of the circumstances includes, but is not limited to, the officers' experience and specialized training, *id*, odd behaviors and actions by the suspect, *United States v. Horton*, 611 F.3d 936, 940 (8th Cir. 2010), suspect's flight upon seeing officers, *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000), and nervous or evasive behavior, *United States v. Brignoni-Ponce*, 422 U.S. 873, 885 (1975).

In *United States v. Willis*, the Eighth Circuit Court of Appeals found that a police officer had a reasonable, articulable suspicion criminal activity was afoot when the officer responded to a late-night call for assistance and observed Willis hurriedly leaving the scene. *United States v. Willis*, 967 F.2d 1220, 1223 (8th Cir. 1992). A cab driver had called 911 to report a robbery and the officer responded to the call. *Id.* When Willis saw the officer he fled. *Id.* The officer knew a crime had been reported in the area and a person fleeing from the area was enough to give rise to a reasonable, articulable suspicion. *Id.*

The purpose of a *Terry* stop is to confirm or dispel an officer's suspicions. *Florida v. Royer*, 460 U.S. 491, 500 (1983). A suspect may be arrested after a *Terry* stop if the

arrest is supported by probable cause that the suspect engaged in criminal activity. *Williams v. Decker*, No. 13-2074, 2014 WL 3538499, at *6 (8th Cir. July 18, 2014) (citing *United States v. Aquino*, 674 F.3d 918, 924 (8th Cir. 2012)). Probable cause to arrest exists if "the totality of the circumstances at the time of the arrest is sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense." *Id.* (citing *Joseph v. Allen*, 712 F.3d 1222, 1226 (8th Cir. 2013)).

### 2.      *Analysis*

Mosley argues there was no articulable suspicion or probable cause to support his initial seizure and subsequent arrest for interference with official acts. The Government contends that based on the totality of the circumstances, there was articulable suspicion to seize Mosley for brief questioning and that probable cause then arose, making the arrest constitutional. I find there was articulable suspicion to question Mosley and sufficient probable cause to support his subsequent arrest.

As discussed above, Walker and Roetman had reasonable, articulable suspicion that criminal activity was occurring in or around 1100 10th Avenue SW so as to justify a brief investigatory stop to question Mosely. Similarly to *Willis,* the officers knew that a crime had been reported in the area and that the caller's telephone number was associated with Mosley's address. Upon arriving at the house, Walker watched a man hurriedly slam the front door and then refuse to open the door. As Walker circled to the back of the house, he saw Mosely run out the back door, drop a large duffel bag, and flee. Mosely ignored Walker's commands to stop, ultimately changing directions and attempting to flee around the other side of the house, toward the front. This clearly qualifies as nervous, evasive behavior. The circumstances here were suspicious and justified the officers' seizure of Mosley pursuant to *Terry*.

Furthermore, the officers had probable cause to arrest Mosely after they stopped him. The Iowa Code defines the offense of interference with official acts as follows, in relevant part:

> A person commits interference with official acts when the person knowingly resists or obstructs anyone known by the person to be a peace officer, . . . , in the performance of any act which is within the scope of the lawful duty or authority of that officer, . . . .

Iowa Code § 719.1(a). Walker testified that not only did Mosely run, rather than follow his command to stop, but that he then put up fierce resistance upon being surrounded by officers in the front yard. Mosely took an aggressive posture and had to be forcibly restrained by three officers (Walker, Roetman and Mernka) and taken to the ground in order for handcuffs to be applied. Even after being restrained, Mosely continued to fight and struggle to the point that the officers deemed it necessary to utilize a Taser.

Based on the evidence presented, I find that probable cause existed to arrest Mosely for interference with official acts, as that offense is defined under Iowa law. Neither the detention nor the subsequent arrest violated Mosely's Fourth Amendment rights.

## C. *Did The Seizure and Search Of The Bag Violate The Fourth Amendment?*

### 1. *Applicable Standards*

The search and seizure of personal property is *per se* unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant, issued upon probable case, and particularly describing the place and item to be search or seized. *United States v. Place*, 462 U.S. 696, 701 (1983). "Where law enforcement authorities have probable cause to believe that a container holds contraband or evidence of a crime, but have not secured a warrant, the Court has interpreted the Amendment to permit seizure of the property, pending issuance of a warrant to examine its contents, if the exigencies of the circumstances demand it or some other recognized

exception to the warrant requirement is present." *Id.* Property is also subject to brief investigatory detention, under the same principles as *Terry v. Ohio*, when the officers have reasonable, articulable suspicion the property contains contraband or evidence of a crime. *Id.* at 702. The *Terry* stop rests on balancing the competing interest to determine the reasonableness of the seizure involved. *Id.* at 703. A court must balance the nature and quality of the intrusion on the individual's rights against the importance of the governmental interest alleged to justify the intrusion. *Id.* The government bears the burden of proof. *Id.*

Even when law enforcement officers may legally seize an item or container without a warrant subject to a valid exception, the Fourth Amendment requires that the officers obtain a warrant before the item or container is searched. *Horton v. California*, 496 U.S. 128, 142 n. 11 (1990); *United States v. Jacobsen*, 466 U.S. 109, 114 (1984). If no warrant is obtained prior to the search, the search must be justified under an exception to the warrant requirement. *Riley v. California*, 134 S. Ct. 2473, 2482 (2014) (search incident to arrest); *see also Horton*, 496 U.S. at 142 n. 11; *Colorado v. Bertine*, 479 U.S. 367, 370-72 (1987) (inventory search of automobiles); *United States v. Escobar*, 389 F.3d 781, 784 (8th Cir. 2004) (consent exception). If there is no warrant and no exception to the warrant requirement, the search is unconstitutional and the evidence must be suppressed. *Mapp v. Ohio*, 367 U.S. 643, 648 (1961) (citing *Weeks,* 232 U.S. at 391-92, 398; *Wolf v. People of State of Colorado*, 338 U.S. 25, 28 (1949)).

### 2. *Analysis*

#### a. *Seizure of the bag*

Mosley argues the officers did not have sufficient exigent circumstances or articulable suspicion to re-enter his property and seize the duffel bag after he had been arrested and secured. The Government contends the exigent circumstances of the situation created reasonable, articulable suspicion to justify their re-entry on Mosley's

property and to secure the bag. I agree with the Government that there was reasonable, articulable suspicion to seize and secure the duffel bag.

When determining if *Terry* principles apply to personal property, I am to balance the competing interests of the exigencies of the circumstances, officer safety and preservation of evidence with the individual's Fourth Amendment and privacy rights. See *Place*, 462 U.S. at 701-704; *Horton*, 611 F.3d at 940; *Wardlow*, 528 U.S. at 124; *Brignoni-Ponce*, 422 U.S. at 885. Here, the circumstances were exigent and required the officers' intervention. The officers were dispatched to the area based on a report of domestic violence and when they arrived, the reporting party could not be located. When the officers approached Mosley's house, which had previously been associated with the caller's telephone number, Mosley fled from the house with a black duffel bag in an apparent attempt to evade police questioning. He then threw the bag near a parked vehicle on his property and ran in the opposite direction. When the officers apprehended Mosley, he physically resisted them and continued to refuse to cooperate. Under these circumstances, the officers had a reasonable and articulable suspicion that the discarded duffel bag may have contained contraband or evidence of a crime.

Moreover, the officers could reasonably fear that any contraband or evidence in the bag was at risk of destruction if the bag was not secured without a warrant. The bag was in an unsheltered outdoor location and a heavy rain was falling. The officers also noticed a crowd gathering around the area. With these additional risks of potential evidence damage or destruction, the officers were justified in securing the bag by seizing it and placing it the trunk of Walker's squad car.

Merely securing the duffel bag was only a minor, and reasonable, intrusion on Mosley's Fourth Amendment rights. The balancing test in this situation favors the legitimate government interest in protecting possible evidence over the limited invasion of Mosley's rights.

### b.    Search of the bag

So far, I have found with little difficulty that the FDPD's actions of entering onto Mosely's property, attempting a *Terry* stop, arresting him and seizing his duffel bag were all reasonable under the circumstances and did not violate Mosley's constitutional rights. The warrantless search of the duffel bag, however, is far more troubling.    The Government makes two arguments in attempting to justify that search: (a) Mosley abandoned the duffel bag when he dropped it during his flight from the officers, thereby relinquishing any Fourth Amendment rights or expectations of privacy he may have had in the bag, and (b) the plain view/plain smell doctrine applied, thus justifying the warrantless search.  Neither argument is persuasive.

### i.    Abandonment

A warrantless search of voluntarily abandoned property is constitutional because "any expectation of privacy in the item is forfeited." *United States v. Chandler*, 197 F.3d 1198, 1200 (8th Cir. 1999) (quoting *United States v. Tugwell*, 125 F.3d 600, 602 (8th Cir. 1997)).  For abandonment to be valid it must be voluntarily, of the subject's own free will, *United States v. Washington*, 146 F.3d 536, 537-538 (8th Cir. 1998), and must not be the product of police misconduct.  *United States v. Koessel*, 706 F.2d 271, 274 (8th Cir. 1983).  Whether an abandonment has occurred is determined on the basis of objective facts.  *United States v. Landry*, 154 F.3d 897, 899 (8th Cir. 1998).  In making this determination, the issue becomes whether the defendant, in leaving or discarding the property, relinquished his reasonable expectation of privacy in the property.  *United States v. Hoey*, 983 F.2d 890, 892-893 (8th Cir. 1993).

Here, there is no doubt that Mosely dropped the duffel bag and ran, leaving it behind.  However, he left the bag on his property, in his backyard, just feet from the rear entrance to his home and shielded by two vehicles parked in the yard.  Based on the

evidence presented, including numerous photographs of Mosley's property, I find that the bag was within the curtilage surrounding the home. The Eighth Circuit has explained:

> The "centrally relevant consideration" in any curtilage determination is "whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." . . . We resolve such questions "with particular reference to four factors: [1] the proximity of the area claimed to be curtilage to the home, [2] whether the area is included within an enclosure surrounding the home, [3] the nature of the uses to which the area is put, and [4] the steps taken by the resident to protect the area from observation by people passing by."

*Wells*, 648 F.3d at 677 (quoting *Dunn*, 480 U.S. at 301). These factors weigh heavily in favor of a finding that Mosely's back yard, where he dropped the duffel bag, is part of curtilage of his home.

The area in question is immediately adjacent to the rear door of the home. That factor, alone, suggests that it is within the "umbrella" of the home. Moreover, it is partially enclosed by a fence on one side and is effectively enclosed on two other sides by, respectively, the house and a wooded lot. One side is open to and visible from the adjacent side street. *See* Gov't Exs. 4, 5. It is clear from the photographic evidence and the testimony of Mosley's sister, Wanda Mosely, that the back yard is used to park cars and store personal property items. While there is no full-scale privacy fence to completely shield the yard from observation by passersby, it is certainly secluded enough, and in close enough proximity to the home, that it would not be mistaken as public space. The area in which Mosley left the duffel bag, between two parked vehicles in his own back yard, was within the curtilage of his home.[1]

---

[1] The Government does not argue otherwise. Mosely argued in his opening brief (and during oral argument) that the relevant portions of the side and back yards of the house were part of the curtilage of the house. *See, e.g.,* Doc. No. 18-2 at 14-19. The Government did not contest this characterization in its resistance or supporting brief. *See* Doc. Nos. 25, 25-1. Nor did counsel for the Government contend during oral argument that the area where the duffel bag was dropped was not within the home's curtilage.

This finding eviscerates the Government's abandonment argument. As noted above, the curtilage surrounding one's home is afforded the same level of constitutional protection as the home itself. *Wells*, 648 F.3d at 675. Thus, a citizen does not abandon, or relinquish his expectation of privacy in, personal property by placing that property within the curtilage of his or her home – even while attempting to evade its detection.[2] *See, e.g., Hobson v. United States*, 226 F.2d 890, 894 (8th Cir. 1955). In *Hobson*, officers approached a house without a warrant to investigate their suspicion that the occupants were illegally selling narcotics. *Id.* at 891. After two officers knocked at the front door and were denied entrance, they forcibly entered the dwelling. *Id.* An officer located near the rear of the home then observed an individual inside the home throwing a package out of a window and into the yard. *Id.* The officers seized the package and found it to contain heroin. *Id.* at 891-92. In reversing the defendant's conviction, the court held that the package had not been abandoned because it remained within the curtilage of the home, even after being thrown from the window into the yard. *Id.*

By contrast, the Government has cited no case finding abandonment of personal property when that property was placed within the curtilage of a suspect's home. Indeed, counsel for the Government acknowledged during argument that apart from "trash pull" cases,[3] he is aware of no case finding abandonment when personal property was found in the owner's yard. Nor have I located such a case through independent research.

---

[2] The analysis would be far different if Mosley's flight had taken him off his own property and he dropped the bag elsewhere. *See Willis*, 967 F.2d at 1223 (abandonment found where suspect dropped shopping bag in a restaurant parking lot while fleeing law enforcement). Here, however, the bag remained on Mosley's property until the officers seized it.

[3] "Trash pull" cases involve items seized from trash that has been left out for collection. The Eighth Circuit has stated: "It is well settled that there is no reasonable expectation of privacy in trash left at the curb in an area accessible to the public for pick-up by a trash company." *United States v. Williams*, 669 F.3d 903, 905 (8th Cir. 2012) (citing *United States v. Trice*, 864 F.2d 1421, 1423 (8th Cir. 1988)) (in turn citing *California v. Greenwood*, 486 U.S. 35, 40–41 (1988)). The Government does not argue, nor does the evidence even slightly suggest, that this principle applies here.

A citizen does not abandon a container, or its contents, by placing it within the curtilage of his or her home. Here, Mosely did not cede his reasonable expectation of privacy in his duffel bag by placing it between two parked cars in his own back yard. The Government's argument that Mosely voluntarily abandoned the bag must fail.

### ii.    *Plain View/Plain Smell*

In the alternative, the Government argues the plain view/plain smell doctrine allowed the duffel bag to be searched without a warrant. This doctrine gives law enforcement officers the right to "seize, without a warrant, an item that is (1) in plain view, (2) when it is observed (or smelled) from a lawful vantage point, (3) where the incriminating character of the item is immediately apparent." *United States v. Banks*, 514 F.3d 769, 773 (8th Cir. 2008) (citing *Horton*, 496 U.S. at 136-37). "The third requirement, that the incriminating character of the item be immediately apparent, is satisfied when police have 'probable cause to associate the property with criminal activity.'" *Id.* (quoting *United States v. Raines*, 243 F.3d 419, 422 (8th Cir. 2001)). The rationale of the plain view doctrine is "to reduce needless, and sometimes dangerous to the police or evidence, inconvenience in requiring the officers to ignore the immediately apparent evidence"; it may not be used to extend a general exploratory search from object to object until something incriminating at last emerges. *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971).

There are limits on the plain view doctrine implicit in its rationale. *Coolidge*, 403 U.S. at 468. One such limit is that no amount of probable cause can justify a warrantless search absent exigent circumstances. *Id.* Thus, "[e]ven when government agents may lawfully seize such a package to prevent loss or destruction of suspected contraband, the Fourth Amendment requires that they obtain a warrant before examining the contents of such a package." *Jacobsen*, 466 U.S. at 114. Simply put, the plain view doctrine provides an exception to the warrant requirement for the *seizure* of property, it does not

provide an exception for a search. *United States v. Jackson*, 131 F.3d 1105, 1108 (4th Cir. 1997).

In applying these standards, I will first assume that the FDPD officers' testimony concerning the events at issue is entirely credible. As I will explain below, it is my conclusion that the plain view/plain smell doctrine would fail to justify the warrantless search of the duffel bag even if full credit is given to that testimony. However, because this is a report and recommendation that will be reviewed by the district court, I will also make findings based on my first-hand observations of the witnesses and my efforts to reconcile conflicting evidence. Thus, if the district court disagrees with my "assuming the truth" analysis, it can give whatever weight it might deem appropriate to my credibility findings.

***Assuming the truth of the law enforcement testimony.*** If full credit is given to the law enforcement testimony presented during the hearing, then (a) the zipper of the duffel bag was partially open when the bag was located, (b) the officers could, by shining a flashlight into the opening, see either a jar that appeared to contain marijuana (Walker) or plastic material that could have been drug packaging (Mernka) and (c) the bag was emitting a strong smell of marijuana. Under these circumstances, the plain view/plain smell doctrine did not justify the warrantless search of the bag. As noted above, the doctrine provides a justification for *seizing* an item, but (in the absence of an exception to the warrant requirement) not for *searching* it. Here, assuming the officers could smell marijuana and could see items that appeared to be drugs or drug packaging, those sensory facts simply provided further justification for taking the bag into custody.[4]

Once the bag was in police custody, however, no exigency existed. There was no longer any risk of destruction of evidence or danger to the officers. Nor does the

---

[4] I have already found that the seizure of the bag was appropriate to preserve evidence and prevent its destruction in light of (a) Mosley's suspicious behavior, (b) the heavy rain that was falling and (c) testimony that a crowd was beginning to form at the scene of these events.

Government contend that any ongoing concerns about the welfare of Chiesa – the caller who reported the domestic assault – created an exigency that required an immediate search.[5] There was simply no emergency that justified a warrantless search of the seized bag.

Nor was the search of the bag a search incident to Mosely's arrest. The Government does not contend otherwise. While a police officer is permitted to conduct a warrantless search upon making a lawful arrest, the scope of that search is limited to "'the arrestee's person and the area within his immediate control,' that is, 'the area into which an arrestee might reach in order to grab a weapon or evidentiary items.'" *United States v. Perdoma*, 621 F.3d 745, 750 (8th Cir. 2010) (quoting *Chimel v. California*, 395 U.S. 752, 763 (1969)). This exception "derives from interests in officer safety and evidence preservation that are typically implicated in arrest situations." *Arizona v. Gant*, 556 U.S. 332, 338 (2009). Here, of course, Mosely was subdued and arrested in his front yard while the duffel bag was found in the back yard. There is no evidence that the bag was within Mosely's immediate control, or otherwise in a location he might have been able to reach, at the time of his arrest.

No exception allowed the FDPD to search the duffel bag without a warrant. Once the bag was in police custody, the officers had the time and opportunity to apply for a search warrant. Mere inconvenience for the officers or the slight delay necessary to prepare the affidavits of probable cause and then present those papers to a judicial officer is not an appropriate excuse or reason to bypass Mosley's constitutional rights. *Hobson*, 226 F.2d at 894. Even when the sworn testimony of the FDPD officers is accepted as being true and accurate, the search of the bag at the Law Enforcement Center was plainly unconstitutional and, as a result, all evidence obtained from that search must be

---

[5] If the officers believed the duffel bag contained evidence bearing on Chiesa's immediate safety, then it should have been searched on site rather than being placed in the trunk of Walker's squad car for an eventual search at the Law Enforcement Center.

suppressed. *Segura v. United* States, 468 U.S. 796, 804 (1984) ("Evidence obtained as a direct result of an unconstitutional search or seizure is plainly subject to exclusion.").

*My Findings.*  For the reasons set forth above, I conclude that the warrantless search of Mosley's duffel bag was unlawful even if the testimony of the FDPD witnesses is taken at face value.  Should the district court disagree, however, I will set forth my findings of facts relevant to the plain view/plain smell analysis.  For the reasons set forth below, I do not believe some of the testimony that was presented.

There are numerous, significant inconsistencies in the Government's evidence:

a.     Walker and Mernka testified to a strong smell of marijuana as they approached the duffel bag.  However, on cross-examination both admitted to not including that rather important detail in their respective incident reports.

b.     Walker and Mernka testified the bag was partially unzipped when they found it, to a large enough extent that they allegedly could see suspicious items by shining a flashlight into the opening.  Both also specifically and emphatically testified that neither touched the bag's zipper.  Yet when the bag arrived at the Law Enforcement Center, Gruenberg noted in his report the bag was "fully zipped."  At the hearing, Gruenberg sat at counsel table and heard the testimony of his fellow officers.  He then testified that his report may have been wrong and that the bag may have been only partially zipped when it arrived.

c.     Despite testimony that the bag was partially open, and that rain was falling so heavily as to flood and disable a police department camera, photographs taken at the Law Enforcement Center depict the bag's contents as being dry.  Gov't Exs. 12-15.  The contents include a dry brown paper bag that, according to the testimony, enclosed the glass jar Walker allegedly could see by peering into the bag's opening.  Gov't Exs. 12-13.  The Government presented no testimony that the officers covered the bag, or shielded it with an umbrella, to keep its contents dry at the scene.  Yet somehow a paper bag that was in plain view because of a partially-opened zipper stayed dry during a downpour.

d.    Roetman acknowledged that his incident report references a comment Mernka made at the scene that the bag contained a large amount of narcotics.  Based on Walker's and Mernka's testimony, Mernka could not have known that.  Walker and Mernka testified that the bag was not searched at the scene.  Mernka testified that when he looked through the alleged opening, he could only see plastic or cellophane material that might have been drug packaging.

e.    Walker testified that he attempted to document the positioning of the bag, the partial opening of the zipper and its location, by taking photographs at the scene.  However, his camera allegedly shut down due to heavy rain after only one photograph was taken.  Moreover, this sole photograph, which could be critical, mysteriously disappeared.  Walker testified that he uploaded it to his FDPD computer but has since been unable to locate it.  No explanation was provided.

Based on these inconsistencies, and my observations of the witnesses, I do not find the testimony of the FDPD officers to be credible with regard to the duffel bag.  Instead, I find that the bag was fully zipped when first discovered by Walker, and later observed by Mernka.  Thus, I reject Walker's and Mernka's testimony that they were able to view any contents of the bag by simply peering through its alleged opening.  I further find that the bag did not emit a strong smell of marijuana, as neither Walker nor Mernka included that critical fact in their respective reports.  Based on these findings, I reject the Government's effort to apply the plain view/plain smell doctrine – even if that doctrine might otherwise have supported a warrantless search.  The warrantless search of Mosely's duffel bag was illegal and all evidence discovered as a result of that search must be suppressed.

***D.     Should Evidence Gathered From Subsequent Search Warrants Be Suppressed?***

***1.     Applicable Standards***

The exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search, but also evidence later discovered and found to be derivative of an illegality or "fruit of the poisonous tree." *Segura*, 468 U.S. at 804 (citing *Nardone v. United States*, 308 U.S. 338, 341 (1939)). The question that remains 'is whether the challenged evidence was come at by exploitation of the initial illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Id.* (Citing *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)). One such means sufficiently distinguishable is the independent source doctrine. *Murray v. United States*, 487 U.S. 533, 537 (1988). The independent source doctrine is described as follows:

> "The interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a *worse*, position that they would have been in if no police error or misconduct had occurred... When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation."

*Id.* (quoting *Nix v. Williams*, 467 U.S. 431, 443 (1984)). In essence, the doctrine provides that evidence obtained independently from activities untainted by the initial illegality is admissible. *Id.*

***2.     Analysis***

Mosley argues that all additional evidence discovered during the search of his home and bank accounts should be suppressed as "fruits of the poisonous tree," because the warrants for those searches were based almost entirely on the evidence found during the warrantless search of the duffel bag. At argument, counsel for the Government conceded that if the search of the bag was unlawful, then evidence obtained upon

execution of the subsequent search warrants is subject to suppression, as well. The evidence shows that the Government concession on this issue is appropriate.

After the FDPD found narcotics and a firearm in the duffel bag, Agent Eric Young applied for, and was issued, a warrant to search Mosley's home. The application was supported by an affidavit describing the events that occurred at Mosely's home and itemizing the contents of the bag. The warrant was executed on May 8, 2014. Narcotics and bank account information were discovered. A second warrant, this time for Mosely's bank accounts, was then applied for and issued based on the bank account information, the items found in Mosely's home and the items found in the duffel bag. Based on that warrant, a total of $7,213.72 was seized from Mosely's bank.

The probable cause supporting both warrants was clearly derived from the contents of the duffel bag. There is no evidence that law enforcement had any independent source by which they could have obtained search warrants for Mosely's house or bank accounts. Absent the unlawful search of Mosely's bag, those warrants would not have been issued. Moreover, there is no way to purge the taint of the initial illegality. The evidence gathered as a result of the two search warrants falls squarely within the fruit of the poisonous tree doctrine and must be suppressed.

## IV.    CONCLUSION

For the foregoing reasons, I find that evidence obtained from the search of the duffel bag, and from the execution of the search warrants that followed, should be suppressed. Therefore, I RESPECTFULLY RECOMMEND that Mosley's motion to suppress (Doc. No. 18) be **granted** and that all evidence gathered as a result of (a) the unlawful search of his duffel bag and (b) the two search warrants issued on May 8, 2014, be **suppressed**.

**DEADLINES:** Because this case is set for trial beginning November 3, 2014, any objections to this Report and Recommendation must be filed by **October 8, 2014**.

Responses to objections must be filed by **October 20, 2014**.  Any party planning to lodge an objection to this Report and Recommendation must order a transcript of the hearing promptly, but not later than **October 3, 2014**, regardless of whether the party believes a transcript is necessary to argue the objection.  If an attorney files an objection without having ordered the transcript as required by this order, the court may impose sanctions on the attorney.

**IT IS SO ORDERED.**

**DATED** this 26th day of September, 2014.

_____
LEONARD T. STRAND
UNITED STATES MAGISTRATE JUDGE